UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Donald J. Wigg,                    :
        Petitioner,                :
                                   :
        v.                         :        File No. 1:07-CV-67
                                   :
Robert Hofmann,                    :
Commissioner, Vermont             :
Department of Corrections,        :
        Respondent.               :

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Paper 1)

Petitioner Donald J. Wigg ("Wigg"), through counsel,

brings before the Court his petition for a writ of *habeas*

*corpus* pursuant to 28 U.S.C. § 2254.  In 2003, Wigg was

convicted of lewd and lascivious conduct with a minor

following a trial during which he was acquitted of sexually

assaulting the same minor.  Wigg was sentenced in state

court to 18 months to five years in prison.

Wigg's petition presents three grounds for relief:   1)

that the presumption of his innocence was violated when the

trial court permitted a police detective to repeatedly refer

to the complainant as the "victim" during testimony; (2)

that the trial court abused its discretion in excluding

case-specific testimony from his expert witness on how the

interviews of the complainant failed to satisfy the

scientifically-suggested protocol for best ensuring accurate

interview responses; and (3) that he was "arbitrarily denied due process of law by the Vermont Supreme Courts' (sic) refusal to grant reargument because the Court in explicitly recognizing error of a constitutional magnitude did not weigh the combined harmful effects of the recognized error." (Paper 1 at 10).

The respondent opposes the petition, arguing that with respect to Wigg's first two claims, the Vermont Supreme Court correctly concluded that the errors it found were harmless and disputing Wigg's argument that the Vermont Supreme Court found that the two errors were violations of his constitutional rights. As to Wigg's third claim, the respondent submits that he failed to exhaust the claim before the Vermont Supreme Court and accordingly, pursuant to 28 U.S.C. § 2254(b)(1)(A), he is procedurally barred from raising it here.

For the reasons set forth below, I recommend that Wigg's petition be DENIED.

## Factual Background

In late January 1999, B.M.Y., an eleven-year-old female, accompanied Wigg, a thirty-five-year-old male, on a weekend ski vacation from their home state of Connecticut to

Mount Snow in West Dover, Vermont.  At the time, Wigg's brother was dating B.M.Y.'s mother, and the two families, including Wigg and B.M.Y., had recently taken a ski vacation together.  On the subsequent occasion, B.M.Y.'s mother permitted her to accompany Wigg alone.  B.M.Y. testified that she took a shower after she and Wigg arrived at Mount Snow.  She claimed that after her shower, Wigg removed her towel, rubbed lotion on her back and legs, and opened her vagina with his fingers and stuck his tongue inside her vagina.  She also alleged that later that night, after watching television and going to bed, Wigg unzipped her pajamas and sucked on her breasts.

B.M.Y. did not report the incidents until September 2000, when her mother's new boyfriend, Robert May ("May") confronted her after becoming suspicious that something inappropriate had occurred between B.M.Y. and Wigg.  May acknowledged that during the conversation, he "cornered" B.M.Y. to get her to tell him what had taken place.  After the initial disclosure, May reported the incident to the Connecticut State Police.  Trooper Francis Budwitz responded to the complaint and conducted an initial interview of B.M.Y., who was accompanied by her mother.  After

determining that the alleged assault occurred in Vermont, he turned the investigation over to Detective Rich Werner of the Dover, Vermont police department. Detective Werner traveled to Connecticut and interviewed B.M.Y. on two separate occasions in late 2000.

Wigg was charged with lewd and lascivious conduct with a minor in violation of 13 V.S.A. § 2602 for sucking on B.M.Y.'s breasts and with sexual assault on a minor in violation of 13 V.S.A. § 3252(a)(3) for inserting his tongue in her vagina. At trial, the state presented seven witnesses, including B.M.Y., her mother, Robert May, Trooper Budwitz and Detective Werner. B.M.Y. testified at length to the nature of her relationship with Wigg, the events leading up to the ski trip she took alone with Wigg, what occurred during the trip, and why she delayed reporting the incidents of abuse. Trooper Budwitz and Detective Werner testified regarding their investigations, the procedures they utilized in interviewing B.M.Y., and what B.M.Y. revealed to them regarding the alleged incidents of abuse. Detective Werner, the lead investigator on the case, repeatedly referred to B.M.Y. as the "victim" during his testimony. Despite the defense's timely objection, the trial judge permitted the

detective to continue using the reference, ruling that use of the term was not highly prejudicial.

Wigg, who did not testify, relied on the cross-examination of each of the State's witnesses and on the testimony of Dr. Philip Kinsler, a psychologist qualified as an expert in interviewing children suspected of being victims of sexual abuse to establish his main defense - that the B.M.Y.'s accusations were untruthful. Wigg planned to call Dr. Kinsler to testify as to 1) the interview techniques most likely to produce accurate responses as well as those techniques most likely to produce inaccurate responses; 2) the extent to which the investigatory interviews conducted by Trooper Budwitz and Detective Werner were conducted in a manner consistent with the recommended techniques; and 3) the impact of any deviations from recommended methods during the police investigation on the credibility of B.M.Y.'s accusations. After listening to Dr. Kinsler's intended testimony *in camera*, the trial judge permitted him to testify about general interviewing techniques, but excluded case-specific testimony analyzing the specific interviews conducted by the police in this case and the resulting impact on the credibility of the

accusations.[1]

Wigg was acquitted of the sexual assault charge but convicted of the lesser charge of lewd and lascivious conduct with a minor. On October 9, 2003, he was sentenced to 18 months to five years in prison. Wigg appealed his conviction to the Vermont Supreme Court, claiming: (1) that his presumption of innocence was violated when the trial court allowed a police detective to repeatedly refer to B.M.Y. as the "victim" during testimony; (2) that the trial court abused its discretion in excluding testimony from his expert witness with regard to the interviewing techniques used by investigators; and (3) that he was entitled to acquittal because the jury verdict convicting him of lewd and lascivious conduct was inconsistent with his acquittal on a charge of sexual assault. State v. Wigg, 179 Vt. 65, 67 (2005). On July 29, 2005, Wigg's conviction was affirmed. The Vermont Supreme Court found that the trial court had committed error with respect to both of Wigg's first appeal issues, but that the errors were both harmless. The court rejected Wigg's third claim, noting that the jury

---

[1] Wigg did not raise the trial court's exclusion of the testimony regarding potential impact of the interview methods on B.M.Y.'s credibility either in his direct appeal or in this petition.

was free to believe B.M.Y. in part and disbelieve her in part. His conviction on the charge of lewd and lascivious conduct and his acquittal on the charge of sexual assault was thus not clearly erroneous, the standard used by the court in reviewing a jury's finding of fact. Wigg, 179 Vt. at 80-81 (citing State v. Martin, 145 Vt. 562, 572, 496 A.2d 442, 449 (1985)).

Wigg submitted a motion for reargument on August 5, 2005 asserting that the Vermont Supreme Court had failed to consider the cumulative effect of the two errors found by the court.[2] (Paper 1-11 at 1-4). The Vermont Supreme Court denied the motion for re-argument, finding that Wigg had "fail[ed] to identify points of law or fact overlooked or misapprehended by this Court." (Paper 1-11 at 5). This petition followed.

## Discussion

### I. Exhaustion

State prisoners seeking federal habeas review ordinarily must first exhaust available state remedies. See

---

[2] Wigg's motion for reargument also asserted that the Vermont Supreme Court failed to address his claim that allowing the lead detective to refer to the complainant as "victim" was more harmful than if someone else had used that term. Because the rejection of the motion by the Vermont Supreme Court rejects the motion as a whole, and because this second argument is not raised here, it need not be addressed further by this Court.

28 U.S.C. § 2254(b) and (c); <u>see</u> <u>also</u> <u>Daye v. Attorney Gen.</u>
<u>of N.Y.</u>, 696 F.2d 186, 190 (2d Cir. 1982)(*en banc*). The
exhaustion requirement "springs primarily from
considerations of comity" between the federal and state
governments. <u>Daye</u>, 696 F.2d at 191. To meet this
exhaustion requirement, a petitioner must have presented the
state courts with "the same claim he urges upon the federal
courts," as a way of giving the state court "an initial
opportunity to pass upon and correct alleged violations of
its prisoners' federal rights." <u>Picard v. Connor</u>, 404 U.S.
270, 275-76 (1971) (internal citations omitted); <u>see</u> <u>also</u>
<u>Jones v. Keane</u>, 329 F.3d 290, 295 (2d Cir. 2003). In order
to have "fairly presented" federal claims to the state
courts, a petitioner must have (1) "set forth in state court
all of the essential factual allegations asserted in his
federal petition," and (2) "placed before the state court
essentially the same legal doctrine he asserts in his
federal petition." <u>Daye</u>, 696 F.2d at 191-92. "[T]he nature
or presentation of the claim must have been likely to alert
the court to the claim's federal nature." <u>Id.</u> at 192. The
Second Circuit has interpreted the exhaustion requirement as
requiring a petitioner to "present the substance of the

same federal constitutional claims that he now urges upon the federal courts to the highest court in the pertinent state." Aparicio v. Artuz, 269 F.3d 78, 89-90 (2d Cir. 2001) (internal quotation marks and citations omitted).

The respondent contends that Wigg failed to bring his third claim: that the cumulative effect of the two errors found by the Vermont Supreme Court was a denial of due process, to the Vermont Supreme Court.  In response, Wigg argues that the express wording of the Vermont Supreme Court's denial of his motion for reargument: "[t]he motion to reargue, filed on August 22, 2005, fails to identify points of law or fact overlooked or misapprehended by this Court," (Paper 1-11 at 5), confirms that the court had considered his legal argument  during their consideration of his direct appeal.  He submits for this Court to conclude that the Vermont Supreme Court had not fully considered this claim would be tantamount to disputing that court's own confirmation as articulated in its order denying his motion to reargue.

Courts have generally held that a federal claim may be "fairly present[ed] to the state courts . . . without citing chapter and verse of the Constitution" in several ways,

including: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis [in factually similar circumstances], (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." <u>Daye</u>, 696 F.2d at 194; <u>accord</u>, <u>Jones v. Vacco</u>, 126 F.3d 408, 413-14 (2d Cir. 1997); <u>Williams v. Lord</u>, 996 F.2d 1481, 1483 (2d Cir. 1993), <u>cert. denied</u>, 510 U.S. 1120 (1994).

Here, although Wigg expressly raised the issue of the cumulative effect of the two errors first in his motion for reargument rather in his direct appeal, his five page motion and incorporated memorandum, prepared on his behalf by counsel, expressly challenges the court's failure to address the combined effect of the two errors in its decision, and stressed the resulting violation of Wigg's constitutional rights to a fair trial. It is evident to this Court from the Supreme Court of Vermont's ruling on that motion that it had recognized and considered the issue in its deliberations. Wigg did, in his motion for reargument,

present his claim that the Vermont Supreme Court failed during consideration of his appeal to consider the cumulative impact of the two instances of errors on his right to a fair trial to that court. The court in turn indicated that it had in fact done so. The Court should therefore conclude that Wigg properly exhausted all three of his claims in support of his petition.[3]

II. Wigg's Claims

In order for a criminal conviction to be sustained on direct review in the face of a constitutional error, the error must be "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d (1967). A constitutional error is harmless if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id.; see also Neder v. United States, 527 U.S. 1, 15, 119 S.Ct. 1827, 1837, 136 L.Ed.2d 35 (1999). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where

_____

[3] Petitioner's brief in support of his petition for *habeas* relief suggests that Wigg's claim regarding the cumulative impact of the errors in his case resulted in a denial of due process, (Paper 52 at 24), was never adjudicated on its merits in state court. If that were the finding of this Court, his claim may be procedurally barred. Because, for the reasons set forth herein, this Court finds that the Vermont Supreme Court did in fact consider this claim, this argument is without merit.

the state court has adjudicated a petitioner's federal claim
on the merits.  <u>See</u> 28 U.S.C. § 2254(d).  Prior to the
passage of ADEPA, the controlling standard to be followed
for collateral review of error in a state court conviction
required that an error be considered harmless if it did not
have a "substantial and injurious effect or influence in
determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507
U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353
(1993)(internal quotation marks omitted).  While the <u>Brecht</u>
standard still applies to *habeas* review, under the AEDPA
standard, the reviewing court may grant *habeas* relief only
where the state court's adjudication of the federal claim on
the merits "was contrary to, or involved an unreasonable
application of, clearly established Federal law, as
determined by the Supreme Court of the United States."  <u>Fry
v. Pliler</u>, 551 U.S. 112, 127 S.Ct. 2321
(2007); 28 U.S.C. § 2254(d)(1).  A state court decision is
an "unreasonable application" of clearly established federal
law if the state court "identifies the correct governing
legal principle from [the Supreme Court's] decisions but
unreasonably applies that principle to the facts of [a]
prisoner's case."  <u>Williams v. Taylor</u>, 529 U.S. 362, 413

(2000). Furthermore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001)(citing Williams, 529 U.S. at 411); see also Yarborough v. Gentry, 124 S.Ct. 1, 4 (2003)(*per curiam*) ("Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable."). Applying ADEPA principles to harmless error review, "habeas relief is appropriate only if the [state] Court of Appeals applied harmless error review in an 'objectively unreasonable' manner." Mitchell v. Sparza, 540 U.S. 12, 8, 124 S.Ct. 7, 12, L.Ed.2d 263 (2003). Habeas relief is also warranted if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," or where the petitioner presents clear and convincing evidence to rebut the presumption that state court findings of fact are correct. See 28 U.S.C. § 2254(d)(2); § 2254(e)(1).

In its review of Wigg's conviction, the Vermont Supreme
Court expressly addressed two of the claims Wigg has
presented here: (1) that his presumption of innocence was
violated when the trial court allowed a police detective to
repeatedly refer to B.M.Y. as the "victim" during testimony;
and (2) that the trial court abused its discretion in
excluding testimony from his expert witness with regard to
the interviewing techniques used by investigators.  With
respect to the first of these claims, the court agreed with
Wigg's contention that the trial court erred in allowing the
state's lead investigator to refer to B.M.Y. as "victim,"
notwithstanding the timely objection by Wigg's counsel, but
after undertaking an analysis to determine whether "absent
the alleged error, it is clear beyond a reasonable doubt
that the jury would have returned a verdict regardless of
the error," the court concluded that the error was harmless.
State v. Wigg, 179 Vt. 65, 70, 889 A.2d 233, 237
(2005)(quoting State v. Wright, 154 Vt. 512. 519-20, 581
F.2d 720, 725 (1989) (Paper 59-4 at 6).  In doing so, it
reviewed the investigator's entire testimony and found that
the context of his testimony indicated that he was using a
term he viewed as synonymous with "complainant." The court

also noted the reasoning of trial court that the jury would normally expect the investigating officer, who is testifying for the State, to believe the complainant.  The court also noted that the investigator never expressed an opinion that B.M.Y. was victimized or that defendant was guilty.  He referred to defendant repeatedly as the "suspect," indicating to the court that he did not intend to convey an opinion of defendant's guilt.  Finally, the court found that even if the jury would expect the detective to believe B.M.Y., it would not, based on his testimony, conclude that he had expressed that opinion.

The Second Circuit has identified the factors relevant in determining whether error at trial was harmless.  These factors include the overall strength of the prosecution's case; the prosecutor's conduct with respect to the evidence at issue; the materiality of the evidence; whether the evidence bore on an issue plainly critical to the jury's decision; and whether it was material to the establishment of a critical fact as opposed to being cumulative of other properly admitted evidence.  See Zapulla v. New York, 391 F.3d 462, 468 (2d Cir. 2004); Wray v. Johnson, 202 F.3d 515, 526 (2d. Cir. 2000); U.S. v. Reifler, 446 F.3d 65,87 (2d.

Cir. 2006).

Applying these factors to the first of Wigg's § 2254 claims, this Court should not conclude that the decision of the Vermont Supreme Court was objectively unreasonable. That court rightly found that the investigator's use of the term "victim" had no inherent probative value, and posed a danger of unfair prejudice because it implied that he and the prosecution believed B.M.Y.'s testimony, but also determined beyond a reasonable doubt that, in light of the investigator's entire testimony and the degree of danger of unfair prejudice, the jury would not have returned a different verdict had he used more neutral terminology. The petitioner, citing myriad aspects of the trial that he believes belie a finding of guilt beyond a reasonable doubt, (Paper 52), argues that the overall strength of the case against him, premised primarily on the testimony of B.M.Y. and without corroborating direct evidence, was not strong, presenting a greater risk of undue prejudice due to Detective Warner's use of the term "victim." However, in light of the entire trial, the use of the term by one witness, even one as prominent as Detective Warner, was not a material aspect of the evidence presented by the

prosecution.  His use of "victim" and the jury's possible conclusion that he believed B.M.Y.'s testimony was not "plainly critical to the jury's decision," particularly as they heard hours of testimony from B.M.Y. herself.  Trial Transcript ("Tr.") 5/1/2003, p.p. 67-166; 5/2/2003, p.p.10-95; 5/5/2003 p.p. 26-45.  Moreover, Warner was subjected to aggressive cross examination by Wigg's counsel, who specifically addressed the detective's use of the word "victim" and suggested it was somewhat inappropriate.  See Tr. 5/7/2003, p 130, lines 3-10.  There was no attempt by the prosecutor either during the presentation of the case or in closing argument to emphasize Warner's use of "victim" or to suggest that the detective believed Wigg to be guilty.  Moreover, whether the investigator referred to B.M.Y. as "victim" or a more neutral term was not material to the establishment of a critical fact in the case against Wigg.

The Vermont Supreme Court properly concluded that allowing Detective Warner to use the term "victim" posed a potential danger of unfair prejudice and was therefore an error and an abuse of discretion by the trial court.  Its further conclusion that the error was harmless beyond a reasonable doubt was not objectively unreasonable.

Wigg's second claim: that the trial court abused its discretion in limiting the testimony of his expert witness by rejecting his case-specific testimony as to whether the officers who interviewed B.M.Y. followed, or deviated from, the proper methods of questioning her, the Vermont Supreme Court properly agreed with Wigg that his expert, Dr. Kinsler, should have been allowed to offer his opinion as to whether the police officer interviews of B.M.Y. were tainted by improper questioning techniques. The trial court had permitted Dr. Kinsler to explain the proper and improper methods of examining children who may be victims of sexual assault. He testified that recommended interview techniques include use of a neutral tone (not assuming that any abuse did or did not take place), allowing children to tell their stories as much as possible in their own words, reliance as much as possible on open ended questions, using "who-," "what-," "where-" type questions as follow-up, using leading questions only as a last resort, and the absence of bribes or rewards. He also testified that children are more inclined to offer answers they believe an investigator wants if s/he is dressed as an authority figure; that teenagers tend to be very suggestible in the face of negative feed-

18

back; that teenagers are not more likely to want to clarify truth than younger children or adults; and that whether a possible victim of sexual abuse cries while being questioned is not of any particular significance. He also noted that repetition of interviews increases the likelihood of inaccurate responses.

The trial court would not allow Dr. Kinsler to apply the recommended interview techniques to the actual circumstances of the interviews of B.M.Y. by the two detectives and comment upon the extent to which they followed or deviated from the recommended approach, finding that to do so would offer an impermissible, implicit comment on the ultimate truthfulness of B.M.Y.'s testimony.[4] The Vermont Supreme Court properly ruled that the trial court's blanket rejection of this portion of Dr. Kinsler's testimony was erroneous. The court determined, however, that the jury ultimately had the benefit of the substance of Dr. Kinsler's excluded testimony because defense incorporated it in challenging the methods used by the investigators. Considering the totality of the circumstances related to the

---

[4] The trial court also excluded Dr. Kinsler's proffered testimony about the impact the behavior of the investigators might have had on B.M.Y.'s report and testimony. That issue was not raised either in Wigg's direct appeal or this petition.

erroneous limitation on Dr. Kinsler's evidence, the court found that the excluded testimony, had it been allowed, would have been essentially cumulative and been highly unlikely to change the result. The error was, therefore harmless beyond a reasonable doubt.

Unlike the use of the term "victim" by Detective Warner, the reliability of the interviews and the impact of the interview techniques on B.M.Y's statements and testimony is of fundamental importance to the fairness of Wigg's trial. Her testimony was the only direct evidence against Wigg presented to the jury. Without it, or if it was ultimately unreliable, there would have been little for the jury to consider. Clearly, the substance of Dr. Kinsler's excluded testimony "bore on an issue plainly critical to the jury's decision." The Vermont Supreme Court reviewed the error in light of the totality of the evidence regarding the interview techniques and the potential impact improper techniques might have had on B.M.Y.'s testimony. The cross examination by Wigg's counsel was largely focused on the extent to which the investigator's failed to comport with recommended interview procedures, and implicitly incorporated the challenges that would have been raised had

Dr. Kinsler been able to comment on the actual interview
procedures and circumstances.  Moreover, during closing
argument, defense counsel had and used the opportunity to
remind the jury of the deficiencies in the manner that the
interviews were conducted.

The Vermont Supreme Court weighed the extent to which
the jury had access to the information wrongfully withheld
due to the limitations placed on Dr. Kinsler's testimony,
and concluded that the only loss caused by the exclusion was
that the jury heard the defense criticism of the officers
questioning of B.M.Y. during defense counsel's cross
examination as opposed to directly from the expert.  <u>Id.</u> at
78 (Paper 59-4 at 10).  The court noted that the jury had
the benefit of Dr. Kinsler's testimony about proper
interviewing techniques, which defense counsel explicitly
applied during its cross examination of the detectives.  The
jury also heard the content of each of the interviews.  The
court also found that B.M.Y.'s first disclosure to May,
prior to any interviews by the police, was consistent with
her trial testimony.[5]  In finding the exclusion of all of

_____

[5] Wigg strenuously rejects the court's finding that B.M.Y.'s
testimony was consistent with her initial disclosure to May, and points to
several details in her testimony regarding dates, sequence and locations
of several ski trips made to Vermont from her home in Connecticut as
indicative of the inherent unreliability of her testimony.  This Court is

Dr. Kinsler's case-specific testimony constituted harmless error, the Vermont Supreme Court concluded that the excluded testimony was highly unlikely to change the result. It found support in this conclusion in the jury's rejection of the more serious charge of sexual assault against Wigg, concluding that the partial acquittal indicated that the jury was clearly aware of the reliability questions surrounding B.M.Y.'s testimony. The court could not "conclude that more specific testimony from the expert witness - drawing conclusions that were obvious based on his earlier testimony and the cross-examination and argument of defense counsel - had a sufficient possibility of changing the result to undermine the defendant's conviction for lewd and lascivious conduct." Id. at 79-80, (Paper 59-4 at 11). The Court accordingly found that the erroneous limitation on Dr. Kinsler's testimony was not harmful beyond a reasonable doubt. In light of the totality of evidence available the

---

mindful, however, that B.M.Y.'s initial disclosure was made nearly two years after the incidents at issue, which took place when she was 11 years old. They occurred during one of three ski trips she made from Connecticut to Vermont with her family and others, one of which she made alone with Wigg. Her trial testimony took place nearly three years after her initial disclosure and more than four years after the incidents. While her recollection of several details regarding the trips (which one occurred first in the sequence and whether she was wearing panties or only a towel, for example) was imperfect, her testimony about the contact with Wigg that resulted in criminal charges was in essence unchanged. This Court cannot conclude that the jury was unreasonable in believing her testimony that sexual contact had occurred, notwithstanding what it could have reasonably concluded were understandable lapses in precise memory.

jury which might have raised questions about the efficacy of
the investigative interviews and the credibility of B.M.Y.'s
testimony, there is no reasonable basis to conclude that the
erroneous exclusion of the case specific testimony had a
substantial and injurious effect on the outcome of Wigg's
trial.  Nor was the determination by the Vermont Supreme
Court that the error was harmless contrary to, or an
unreasonable application of, clearly established Federal
law.  This Court should find that Vermont Supreme Court's
conclusion was not objectively unreasonable.

Wigg's third claim presented to this Court is that the
Vermont Supreme Court failed to recognize that the
cumulative impact of the two errors in his trial resulted a
denial of constitutional due process.  See Taylor v.
Kentucky, 436 U.S. 478, 487 & n.15, 98 S.Ct. 1930, 1935
(1978) ("[C]umulative effect of the potentially damaging
circumstances of this case violated the due process
guarantee of fundamental fairness."); U.S. v. Rivera, 900
F.2d 1462, 1477 (10th Cir. 1990)("Courts have found
fundamental unfairness when error is considered in
conjunction with other prejudicial circumstances within the
trial, even though such other circumstances may not

individually rise to the level of error."); <u>U.S. v. Salameh</u>, 152 F.3d 88, 157 (2d. Cir. 1998). Wigg's primary argument in support of his third claimed basis for *habeas* relief is that the totality of the evidence at his trial was so inadequate that the jury "must" have been on the verge of acquitting him of both charges, and as a result, the two errors impermissibly tipped the balance toward conviction on the charge of lewd and lascivious contact. (Paper 52). In addition to the errors already discussed, Wigg points, among other things, to the degree of animosity between May and Wigg's two brothers, one of whom was the mother's boyfriend at the time the incidents occurred; to May's largely discredited testimony, his mixed motives, and his "glee" upon eliciting the disclosure from B.M.Y; the chaotic nature of B.M.Y.'s home life; the antipathy between B.M.Y. and her mother; the conflicting statements of B.M.Y. and her mother regarding the sequence and location of ski trips; and discrepancies in the details of the testimony of the witnesses. Even the prosecution, in its closing, acknowledged questions about May's credibility and his character. Wigg also points to the jury's request to review portions of B.M.Y.'s testimony and its questions for the

witnesses as indicative of their difficulty in reaching a verdict. He suggests that their deliberation was unusually long, raising further questions about their verdict.[6] <u>See Pliler</u>, 127 S.Ct. 2328-9. Wigg speculates that they may have found some of the evidence puzzling, and suggests that the Court should "consider the contradictory evidence, which "probably show (sic) why the jury had such trouble coming to a verdict." (Paper 52 at 8).

It is evident that Wigg believes that the jury wrongly found that he was guilty beyond a reasonable doubt, and he urges this Court to agree. It is not, however, the role of this Court to assess the quality of the jury's reasoning, but rather to determine whether the decision of the Vermont Supreme Court, in affirming that decision, was consistent with the constitutional protections to which he was entitled.

Wigg correctly points out that the Second Circuit recognizes a "cumulative error" rule for reversal of a conviction or for *habeas* relief. <u>See</u>, <u>e.g.</u>, <u>U.S. v. Lumpkin</u>,

---

[6] Although Wigg correctly points out that the jury deliberated for "parts" of three days, it is apparent that their deliberations lasted no more than the duration of two days. While perhaps this is a period somewhat longer than "average," the Court does not consider this to be an extraordinarily lengthy deliberation following a one week trial.

192 F.3d. 280, 290 (2d. Cir. 1999). Nonetheless, the standards for collateral review of error, whether singular or cumulative, are the same: whether the error (or combined impact thereof, in the case of multiple error) had a substantial and injurious effect or influence in determining the jury's verdict; whether the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established Federal law, or whether its harmless error analysis was objectively unreasonable. See Brecht, 507 U.S. 619; 28 U.S.C. § 2254(d); Mitchell, 540 U.S. at 8.

While it appears that the Vermont Supreme Court implicitly consider the potential cumulative impact of the errors that occurred during Wigg's trial in its decision on his direct appeal, this Court does not have benefit of its recitation of its analysis of the issue. The Court has reviewed, however, the decision of the Vermont Supreme Court and as well as the testimonial evidence presented at Wigg's trial. Although Wigg urges that in light of the errors the jury's verdict was fatally flawed, he has not demonstrated that the Vermont Supreme Court unreasonably applied clearly established federal law, nor has he shown that the errors at

his trial, either singly or in combination, had a substantial and injurious effect on the verdict. Moreover, he has failed to show that the state court's decision was objectively unreasonable. I recommend, therefore, that Wigg's petition for a writ of *habeas corpus* be DENIED.

## Conclusion

For the reasons set forth above, I recommend that Wigg's petition (Paper 1) be DENIED.

Dated at Burlington, in the District of Vermont, this <u>16th</u> day of January, 2009


<u>/s/ John M. Conroy</u>
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72.1, 72.3 & 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).